

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00112-CV

_____

DAVID A. SKEELS, Appellant

V.

JONATHAN T. SUDER, MICHAEL T. COOKE, AND FRIEDMAN, SUDER &
COOKE, P.C., Appellees

_____

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-284262-16

_____

Before Gabriel, Birdwell, and Womack, JJ.
Opinion by Justice Birdwell

## OPINION

### I.     Introduction

This appeal arising from an acrimonious dispute between an incorporated law firm and a departing shareholder primarily concerns the applicability of one of the law firm's governing resolutions to the firm's attempted redemption of the departing shareholder's shares in the absence of a specific document or agreement expressly setting forth the redemption price of those shares. Also at issue is the validity of a sanctions order against the departing shareholder for the content of his pleadings and his conduct in the underlying litigation. Because we hold that the law firm's attempted redemption of the departing shareholder's shares was not authorized by the Texas Business Organizations Code (TBOC), we reverse the trial court's judgment as to the parties' competing claims for declaratory relief and related attorney's fees. Because this reversal necessitates remand of the departing shareholder's common law claims and the trial court's sanctions award, we also remand the remainder of the case to the trial court.

### II.     Factual And Procedural Background

Walker C. Friedman, who is not a party in this case, incorporated Friedman & Young, a Professional Corporation, in 1992 under the Texas Professional Corporation Act. The corporation's name changed several times along with its shareholders. Eventually, Friedman and shareholders Jonathan T. Suder and Michael T. Cooke changed the firm's name to Friedman, Suder & Cooke, P.C. (FSC).

2

In 2007, FSC hired appellant David A. Skeels as an associate attorney. He became a shareholder in January 2011, and FSC purported to issue him 1,000 shares.[1] Skeels did not pay any consideration or make any capital contribution in exchange for his shares; instead, he contends that he paid for that status in "sweat equity": his prior work for the firm that yielded positive trial outcomes and financial results.

FSC did not have a written agreement regarding shareholder compensation; instead, the firm employed a unique compensation system for the shareholders who worked on certain cases (the Team), mostly contingency-fee cases, with Suder and Cooke. Revenue from the Team's cases was shared equally among all shareholders on the Team regardless of whether the shareholder had personally worked on a case.[2] FSC paid Skeels a fixed monthly draw amount. But at the end of the year, if Skeels's percentage of the Team's net revenue exceeded what he had been paid in monthly draws, he would be paid that excess.

In February 2014, in anticipation of an upcoming audit, FSC's seven shareholders—including Skeels—signed a resolution (the Resolution) "to ratify, confirm and memorialize in writing a policy and practice of [FSC], and a right possessed by" Friedman, Suder, and Cooke individually "before any current shareholder [other than those three] became a shareholder." To further that policy, the shareholders resolved that,

---

[1]The firm did not issue physical stock certificates until February 2014.

[2]Not all of FSC's shareholders were part of the Team.

> [n]otwithstanding the number of shareholders, or the number of shares issued to any shareholder, [Friedman, Suder, and Cooke], collectively, have been entitled, and shall continue to be entitled, to take affirmative action on behalf of [FSC], and veto any vote or action taken by or on behalf of [FSC], and/or by any other shareholder, whether individually, or collectively.

Suder later described the Resolution as reflecting and memorializing "the way things were done around the firm" because Friedman, Suder, and Cooke individually "were the founding persons who incurred all the risk and expense in forming the firm." According to Suder, the shareholders entered into the Resolution rather than designating different classes of stock or different amounts attributable to the stock.[3]

Skeels eventually became dissatisfied with the Team's compensation system and with Suder in particular. FSC claims that Skeels began planning to leave the firm as early as April 2015 although Skeels claims that he simply began negotiating for opportunities at another law firm to increase his leverage to negotiate better compensation at FSC. Skeels and another FSC shareholder started discussing these issues with each other and a competing law firm. In December 2015, Suder and Cooke discovered these communications after finding emails among Skeels, the other FSC shareholder, and an attorney with the competing law firm. Suder and Cooke terminated Skeels's employment with FSC that month. At the time, the Team was expecting a contingency fee from a case Skeels had worked on that was on appeal (the

---

[3]Cooke likewise explained that the Resolution was prepared so that the younger shareholders could never outvote the three controlling shareholders, who would keep control of the firm.

4

Lightning Ballast case), but which had a petition for writ of certiorari pending at the United States Supreme Court. FSC did not calculate that fee as part of the Team's 2015 revenue, but Skeels knew the fee was likely to be paid in 2016 and had not wanted to leave the firm until then.

In January 2016, Skeels personally wrote a letter to Cooke, as "Shareholder, Director, and President" of FSC, requesting to examine and copy FSC's books, records, documents, and information "to evaluate and determine [his] rights in connection with [his] involuntary termination" from FSC. In response, FSC's lawyer sent Skeels's lawyer "an index of materials which are given to all FSC lawyers at the end of each year in a notebook prepared by the firms' bookkeepers and managers" that, according to the letter, "Skeels [had] received . . . each year that he was employed at FSC." The attorney represented that the information "largely cover[ed]" Skeels's request.

FSC's attorney also sent Skeels's attorney a letter asking Skeels to voluntarily surrender his shares in FSC in exchange for a mutual release. However, he warned that if Skeels did not do so, FSC would, "pursuant to the Resolution," formally redeem the shares "at the value consistent with [FSC's] practice for all departing shareholders . . . since it began its existence." The letter said that although FSC could redeem those shares immediately, it intended to follow the procedure in TBOC Section 21.305, which it invoked in the letter, setting the redemption date as March 11, 2016, for a redemptive price of "zero[,] . . . consistent with the value that

5

other departing shareholders received in connection with their departure from the firm." Tex. Bus. Orgs. Code Ann. § 21.305.

Skeels's counsel rejected the offer on February 18, 2016. In the rejection letter, he alluded to the Lightning Ballast fee, stating that Skeels expected to be compensated for his part, asserting that he "did most of the work on that case." Skeels's counsel disputed that FSC's redemption letter could properly serve as notice under Section 21.305; he also opined that Skeels's shares were "not redeemable" under Section 21.305 but that even if they were, they had more than zero value.

Skeels sued FSC as an individual and sued Suder and Cooke derivatively as a shareholder. In his original forty-one-page petition—which contained a twenty-one-page factual background complaining primarily about Suder—Skeels brought a derivative breach of fiduciary duty claim against both Suder and Cooke under TBOC Section 21.563, asserting that FSC is a closely-held corporation. *Id.* § 21.563 (defining "closely held corporation" as a corporation with fewer than thirty-five shareholders and no publicly traded or quoted shares and also setting forth specific rules for derivative actions by shareholders). Skeels alleged that Suder and Cooke had breached their duty of loyalty and good faith to FSC and to Skeels by terminating his employment and failing to provide him full disclosure. Skeels also brought claims against FSC for

- mandamus relief to allow him to examine and copy FSC's books, records, minutes, and documents so that he could "evaluate and determine his rights in

6

connection with his involuntary termination from FSC and issues and proposals regarding his separation from FSC," *see id.* § 21.218(b);

• a declaratory judgment that neither TBOC Section 21.305 nor the Resolution authorized "FSC to serve notice of redemption . . . of Skeels'[s] 1,000 shares of FSC, . . . to redeem . . . Skeels'[s] . . . shares," or to require Skeels to surrender his FSC stock certificate, *see id.* § 21.305;

• temporary and permanent injunctive relief prohibiting FSC from requiring Skeels to voluntarily return his 1,000 shares or seeking any further redemption of those shares; and

• attorney's fees under TBOC Section 21.218(b) and the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

Skeels signed the petition, verifying "that every statement contained in Paragraphs I, II, III, IV, VI, VIII, and IX [was] within his personal knowledge and true and correct." Paragraph III contained the derivative claims against Suder and Cooke.

Visiting Senior Judge Jeff Walker was assigned to hear the suit. He issued an ex parte temporary restraining order for Skeels but ultimately denied a temporary injunction. All of the appellees answered, raised affirmative defenses, and requested sanctions for groundless pleadings brought in bad faith "for the purpose of harassment."

Two weeks after Skeels filed his original petition, he filed an amended petition, in which he expanded his derivative breach of fiduciary duty claim to include

7

allegations that Suder and Cooke were being paid "far in excess of what was reasonable for [their] position and level of responsibility," that they "withheld dividends" from Skeels, and that they had mismanaged FSC by mismanaging the Team. Skeels also added an individual breach of fiduciary duty claim against both Suder and Cooke for injuries to him as a minority shareholder. Skeels further added a claim against FSC for the "wrongful attempt to redeem his shares." Skeels verified his first amended petition, but the verification did not include the factual allegations in the paragraphs alleging the derivative claims and individual claims against Suder and Cooke.

After filing his amended petition, Skeels retained new counsel, and the trial court allowed his former counsel to withdraw. Skeels's new counsel filed a second amended petition that omitted the individual and derivative breach of fiduciary duty claims against Suder and Cooke but that retained the mandamus, declaratory judgment,[4] and injunctive claims against FSC along with the attorney's fees request. Skeels added new claims against FSC for breach of an alleged contract by terminating his employment in 2015 to avoid paying his share of the Team's 2016 net profits and for promissory estoppel by breaking its alleged promise to pay him 12.5% of the Team's yearly profits for so long as he was a shareholder regardless of whether he had worked on any of the Team's cases.

---

[4]He shortened his request for declaratory relief, asking only for a declaration "that the attempted redemption of [his] shares was void and/or had no legal effect on [his] ownership in FSC."

Skeels added an unjust enrichment claim against both Suder and Cooke individually—pleaded in the alternative to his breach of contract and promissory estoppel claims against FSC—for "conspir[ing] to obtain an unfair advantage or benefit by terminating [his] employment at the end of 2015, in order to avoid sharing the [Team's] net profits." Skeels also alleged that FSC had failed to observe corporate formalities and sought a judgment for the imposition of individual liability on Suder and Cooke, jointly and severally with FSC, because "the [complained-of] acts of [FSC] . . . were the acts of . . . Suder and Cooke individually."

In response to the second amended petition, FSC filed an amended answer, in which it claimed that Skeels had brought the mandamus action for an improper purpose because of his long-standing "animosity toward one or more Defendants." FSC alleged that "[t]he true point of [Skeels's] suit is to attempt to harass and embarrass [FSC, Suder, and Cooke], and disrupt [FSC's] business in order to extract compensation that is not due to [Skeels] and/or to force the purchase of shares in FSC at a grossly inflated price." FSC also filed a counterclaim for a declaratory judgment that the Resolution is a "governing document," as defined in the TBOC, which "authoriz[es] all of the actions taken by FSC of which Skeels complains." FSC also filed a motion for partial summary judgment on Skeels's breach of contract, promissory estoppel, and unjust enrichment claims, which the trial court denied.

The parties entered into an agreed scheduling order that included expert-designation deadlines. After those dates had passed, FSC filed a motion in which it

9

(1) asserted that Skeels was purporting to provide lay testimony at trial as to the valuation of shares in FSC, (2) argued that such testimony was more properly expert testimony but that Skeels had not timely designated himself as an expert and was not qualified as an expert, and (3) asked the trial court to prohibit Skeels from testifying as to the value of the shares. The trial court granted the motion after a hearing but set a new expert-designation deadline. Skeels timely designated an expert, Lamar Casparis, to testify about the value of his shares. Appellees then filed a motion to strike Casparis's testimony, challenging his methodology and continuing to argue that the valuation of Skeels's shares was not at issue in the case. The trial court granted this motion on the Friday immediately preceding the Monday, September 11, 2017 trial date.

During the same hearing—in the context of urging that Casparis's proposed testimony was not relevant to any issue in the case—FSC argued that "whether the [R]esolution is a governing document that allowed [FSC] to cancel the share" is "a purely legal issue" to be determined by the trial court and not a jury. The trial court agreed but did not sign any order that day.

Skeels's counsel appeared for trial on September 11, 2017, but also filed a verified motion for continuance because of a family emergency. The trial judge denied the motion, but he recessed the trial until September 18, 2017, and signed an order ruling that "the Resolution . . . authoriz[ed] all of the actions taken by [FSC] of which

[Skeels] complains in his Second Amended Petition." The order reserved a determination of attorney's fees and costs for "a later date."

When the parties reconvened on September 18, 2017, Skeels's counsel told the trial court that because his remaining claims were premised on shareholder status, no claims remained to be tried in light of the trial court's legal ruling for FSC. Thus, the only matter the parties tried that day was appellees' sanctions motion. After two days of hearing evidence, the trial court took the matter under advisement.

On October 26, 2017, the trial court adopted appellees' twenty-seven-page proposed findings of fact and conclusions of law related to sanctions, which ultimately concluded that Skeels should pay Suder and Cooke $20,000 in sanctions. The trial court signed a final judgment the same day; that judgment incorporated the sanctions order, rendered a take-nothing judgment for Skeels, rendered a declaratory judgment for FSC on its counterclaim, and assessed court costs and $100,000 in attorney's fees against Skeels.

The trial judge denied a timely motion for new trial after a hearing but signed an amended judgment changing the sanctions award to $10,000 for Suder and $10,000 for Cooke. Skeels then filed this appeal.

## III. The Resolution Did Not Authorize FSC To Unilaterally Redeem Shares

In his first issue, Skeels contends that the trial court erred by awarding declaratory relief to FSC because the Resolution[5] did not give the firm authority to redeem Skeels's shares or, if it did, to redeem them for $0. He also argues that the trial court should have granted his converse declaratory judgment on this question of law: that the attempted redemption was invalid. To answer this question, we must construe provisions of the TBOC.

### A. Applicable law

FSC is a professional corporation.[6] Professional corporations are addressed specifically in Chapter 303 of the TBOC and are subject to the requirements governing professional entities in general set forth in TBOC's Title 7, in which Chapter 303 is located. Tex. Bus. Orgs. Code Ann. §§ 301.001, .003(4), 303.001–.006. But professional corporations are also subject to Titles 1 through 3 of the TBOC,

---

[5]The trial court also rendered a declaratory judgment that the Resolution is a governing document as defined in the TBOC, but Skeels does not challenge that part of the trial court's ruling. He contends that even though the Resolution is a governing document, it nevertheless did not authorize the attempted redemption.

[6]Although FSC is a professional corporation, it has never been designated a "close" corporation under the TBOC (which is defined differently than "closely held corporation"); therefore, Subchapter O of Chapter 21, applicable to close corporations only, does not apply here. *See* Tex. Bus. Orgs. Code Ann. §§ 3.008, 21.701(1), 21.702(a), 21.705–.07.

including Chapter 21 governing "for-profit corporations," except to the extent that Chapter 21 conflicts with Title 7. *Id.* §§ 301.002, 303.001.[7]

Shareholders of a professional corporation must be licensed in the "same professional service" rendered by the professional corporation. *Id.* §§ 301.003(5), .004(2), .007(a). If a shareholder loses that status, he must "promptly relinquish" his ownership interest in the entity. *Id.* § 301.008(b). At that time, the professional corporation "shall purchase or cause to be purchased the ownership interest," upon a "price and terms . . . [that] may be provided by the governing documents of the entity or an applicable agreement." *Id.* § 301.008(d). If only one person owns all of the entity's outstanding ownership interests, that person can act as a "managerial official or owner" of the entity only for the time it takes to wind up the entity's affairs. *Id.* § 301.008(e). But if a shareholder of a professional corporation with more than one shareholder remains licensed but dies, becomes incompetent or bankrupt, resigns, withdraws, retires, or is expelled from the professional corporation, the entity

---

[7]Before 1960, no state allowed lawyers or other professionals to incorporate, but now all states allow it. Christopher C. Wang, *Breaking Up Is Hard To Do: Allocating Fees From The Unfinished Business Of A Professional Corporation*, 64 Univ. Chic. L. Rev. 1367, 1372 (Fall 1997). Initially, significant tax advantages attached to the formation of a professional corporation; now, "the primary advantage of the professional corporation is the limited liability it affords to its members." *Id.* at 1372–73; *see also* 20 Tex. Prac. Bus. Orgs. § 24:1 (noting that professional corporations historically developed to benefit from tax-advantageous retirement plans for professionals). Although a professional corporation possesses significant corporate attributes, as a practical matter it often functions as a partnership in the law firm context, in terms of the relationship among the shareholders and compensation. *Id.* Texas law expressly allows this type of management by shareholder agreement. *See* Tex. Bus. Orgs. Code Ann. § 21.101(a)(12).

continues to exist and need not wind up its affairs *Id.* § 303.005. Moreover, no provision in the TBOC requires the professional corporation to redeem or repurchase the shares of a departing shareholder who is still licensed to practice the professional services the entity provides.[8] Thus, FSC was not required to redeem Skeels's shares upon terminating his employment with the firm.

---

[8]Texas law comports with other states' laws in this respect, and courts in those states have declined to compel redemption of a licensed, departing shareholder's shares in the absence of a statute, corporate document, or specific agreement requiring such a redemption. *See, e.g.*, *McCormick v. Dunn & Black, P.S.*, 167 P.3d 610, 619 (Wash. Ct. App. 2007) ("The courts do not have the power to make a stock redemption agreement where the parties failed to do so."), *review denied*, 163 Wash. 2d 1042 (2008); *Corlett, Killian, Hardeman, McIntosh and Levi, P.A. v. Merritt*, 478 So.2d 828, 829–35 (Fla. Dist. Ct. App. 1985), *review denied*, 488 So.2d 68 (Fla. 1986); *Berrett v. Purser & Edwards*, 876 P.2d 367, 371 (Utah 1994) (refusing also to allow potential for disciplinary rules infraction—unethical fee-splitting—to dictate statutory interpretation); *Trittipo v. O'Brien*, 561 N.E.2d 1201, 1204–08 (Ill. App. Ct. 1990), *appeal denied*, 136 Ill. 555 (1991). *But cf. Vinall v. Hoffman*, 651 P.2d 850, 851 (Ariz. 1982) (holding opposite based on more broadly worded statute that has since been repealed as acknowledged in *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 730 (Ariz. 2006)). Thus, in these states, "[i]f an attorney-shareholder leaves . . . and nothing in [a corporate document or applicable agreement] provides for an automatic redemption of shares, the attorney may end up holding shares that are valueless because of the lack of a market for them." Wang, *supra*, at 1395; *see Ritchie v. Rupe*, 443 S.W.3d 856, 885–86 (Tex. 2014) (explaining that shareholder status does not change nature of at-will employment in absence of agreement to the contrary).

But by not requiring such a redemption, statutory schemes such as Texas's merely kick the can down the road. Under the TBOC, if the departing shareholder ever becomes unlicensed, or an unlicensed person later "succeeds to the ownership interest" of the licensed shareholder—such as by inheritance—the professional corporation must "purchase" the shares at a price and on terms "provided by the governing documents of the entity or an applicable agreement." Tex. Bus. Orgs. Code Ann. § 301.008(c), (d).

A shareholder of a professional corporation may freely transfer his shares to the entity,[9] another of the entity's shareholders, or another licensed member of the same profession unless the professional corporation has limited the right of transfer in a governing document or "an applicable agreement."[10] *Id.* § 301.009. Any transfer restrictions must be noted on the stock certificate representing the shares or incorporated by reference in the manner provided by Chapter 21. *Id.* § 303.003. *But see id.* § 21.213 (providing that restriction not noted on stock certificate is "specifically enforceable against a person other than a transferee for value from the time the person acquires actual knowledge of the restriction's existence").

A transfer of shares from a shareholder to the entity can be accomplished by repurchase or redemption. "Repurchase involves a willing sale from the shareholder to the corporation" while "[r]edemption . . . involves a forced sale to the corporation." Elliot M. Kaplan & David B. Young, *Corporate "Eminent Domain": Stock Redemption and Reverse Stock Splits*, 57 UMKC L. Rev. 67, 68–69 (1988); *Herring Bancorp, Inc. v. Mikkelsen*, 529 S.W.3d 216, 226 (Tex. App.—Amarillo 2017, pet. denied) (op. on reh'g) (distinguishing redemption—"an involuntary disposition of a security pursuant

---

[9]A corporation in general may "acquire its own ownership interests, regardless of whether redeemable, and hold the ownership interests as treasury ownership interests or cancel or dispose of the ownership interests." *Id.* § 2.101(9).

[10]The TBOC defines a governing document as the entity's certificate of formation or "the other documents or agreements adopted by the entity . . . to govern [its] formation or . . . internal affairs." *Id.* § 1.002. The TBOC does not define "applicable agreement."

15

to a pre-existing agreement or right to acquire (purchase) that security in accordance with the terms and provisions of that agreement or right"—from repurchase—"a voluntary disposition of a security on terms and conditions to be negotiated at the time of the disposition and acquisition"). "A redemption by the corporation of its stock is, in a sense, a repurchase of it for cancellation." Russell Stanley Q. Geronimo, *Unbundled Shares: Circumventing Corporate Nationality Rules Through Swaps, Options, and Other Devices*, 19 Asian-Pac. L. & Pol'y J. 84, 120 (2018); *see* Tex. Bus. Orgs. Code Ann. § 21.251(a), (b). Repurchase can result in unfairness to a minority shareholder if he is not given the same opportunity to dispose of his stock at a price as favorable as a majority shareholder, but the opportunities for abuse are greater with redemption because of its involuntary nature.[11] *See Herring Bancorp.*, 529 S.W.3d at 223 n.7; Kaplan,

---

[11]In discussing the status of a minority shareholder in a closely-held corporation, the Supreme Court of Texas described this potential for abuse thusly:

[M]inority shareholders in closely held corporations have "no statutory right to exit the venture and receive a return of capital" like partners in a partnership do, and "usually have no ability to sell their shares" like shareholders in a publicly held corporation do; thus, if they fail to contract for shareholder rights, they will be "uniquely subject to potential abuse by a majority or controlling shareholder or group." Unhappy with the situation and unable to change it, they are often unable to extract themselves from the business relationship, at least without financial loss.

Those in control of a closely held corporation may use various "squeeze-out" or "freeze-out" tactics to deprive minority shareholders of benefits, to misappropriate those benefits for themselves, or to induce minority shareholders to relinquish their ownership for less than it is otherwise worth. The types of conduct most commonly associated with

*supra*, at 69. Therefore, corporations must strictly comply with stock-redemption related statutes or contract provisions. *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 703 (Tex. App.–-Fort Worth 2006, pet. denied), *disapproved of on other grounds by Ritchie v. Rupe*, 443 S.W.3d 856, 871 & n.17 (Tex. 2014).

To fully understand the TBOC's applicability to share redemption in professional corporations, we must understand its scheme for stock redemption applicable generally to for-profit corporations. The TBOC sets forth redemption procedures for for-profit corporations in Chapter 21. Under that chapter, a for-profit corporation may issue redeemable shares only "if authorized by the corporation's certificate of formation." Tex. Bus. Orgs. Code Ann. § 21.154(a)(1). A corporation

---

such tactics include (1) denial of access to corporate books and records, (2) withholding payment of, or declining to declare, dividends, (3) termination of a minority shareholder's employment, (4) misapplication of corporate funds and diversion of corporate opportunities for personal purposes, and (5) manipulation of stock values.

. . . .

Of course, shareholders may also prevent and resolve common disputes by entering into a shareholders' agreement to govern their respective rights and obligations. Importantly, the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the rights, duties, and procedures that govern their relationship with each other and with the corporation.

*Ritchie*, 443 S.W.3d at 879–81.

may not redeem shares that have not been so designated. *Id.* §§ 21.303, .304(a).[12] Chapter 21 also expressly contemplates a transfer of value—either in the form of a payment or the issuance of indebtedness—when a for-profit corporation redeems shares.[13] *Id.* § 21.002(6)(A) (defining a distribution as a "transfer of property, including cash, or issuance of debt, by a corporation to its shareholders in the form of . . . a purchase or redemption, directly or indirectly, of any of its own shares"), §§ 21.302–.303, § 21.304 ("A distribution by a corporation that involves a redemption of outstanding redeemable shares of the corporation subject to redemption may be related to any or all of those shares."), § 21.308 (providing that corporate indebtedness arising from distribution or issued in a distribution "are at parity with the corporation's indebtedness to its general, unsecured creditors"); *see Redemption*, Black's Law Dictionary (11th ed. 2019) (defining "redemption" as "[t]he act or an instance of reclaiming or regaining possession by paying a specific price" or "[t]he reacquisition of a security by the issuer").

---

[12]Chapter 21 nevertheless gives corporations broad authority to enter into shareholder agreements to govern the corporation "as if [it] were a partnership or in a manner that would otherwise be appropriate only among partners and not contrary to public policy" and to enter into shareholder agreements governing "the authorization or making of distributions." Tex. Bus. Orgs. Code Ann. § 21.101(a)(5) (making a shareholders' agreement on redemption "subject to Section 21.303"), (a)(12), § .303, § .104 ("A shareholders' agreement *that complies with this subchapter* is effective among the shareholders and between the shareholders and the corporation even if the terms of the agreement are inconsistent with this code." (emphasis added)).

[13]Section 21.304, entitled "Redemptions," is in the Subchapter entitled, "Distributions and Share Dividends."

A for-profit corporation's board of directors, or shareholders if acting as the board of directors,[14] may authorize a stock redemption and in doing so must determine "the maximum amount that may be distributed." Tex. Bus. Orgs. Code Ann. § 21.302. But Chapter 21 prohibits a distribution "if the corporation would be insolvent" afterward or the distribution exceeds the corporation's surplus.[15] *Id.* §§ 21.301(1)(B), .303(b).

Redemption under Chapter 21 takes effect by call and written notice. *Id.* § 21.304(c). A redemption notice must include "the redemptive price" set by the board of directors and "the place at which the shareholders may obtain payment of the redemptive price." *Id.* § 21.305(a)(3), (4). If the corporation deposits money with a bank or trust company appointed and acting as the corporation's transfer agent and gives payment instructions according to the statutory procedure, the redemption takes

---

[14]Although a corporation ordinarily is managed by a board of directors, *Ritchie*, 443 S.W.3d at 868 n.12, the shareholders may by agreement dispense with the board and manage the corporation through one or more shareholders or manage the corporation "as if [it] were a partnership or in a manner that would otherwise be appropriate only among partners and not contrary to public policy," Tex. Bus. Orgs. Code Ann. § 21.101(a)(2), (12); *see Nolana Open MRI Ctr., Inc. v. Pechero*, No. 13-13-00552-CV, 2015 WL 601916, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 12, 2015, no pet.) (mem. op.).

[15]The right of a corporation to reacquire its own shares is commonly limited by provisions designed to protect the rights of creditors; thus, statutes frequently provide that a corporation may not acquire its own stock if such an acquisition would reduce its net assets below its stated capital or would render the corporation incapable of paying its debts as they fall due. Elliot M. Kaplan & David B. Young, *Corporate "Eminent Domain": Stock Redemption and Reverse Stock Splits*, 57 UMKC L. Rev. 67, 70 (1988).

effect on the date of that deposit and giving of payment instructions, unless the corporation's certificate of formation provides otherwise. *Id.* § 21.306. The shareholder has no further right related to the shares other than the right to payment of the distribution amount (or the right to convert the share, if any) upon surrender of the share certificate. *Id.* §§ 21.306(c)–.307.

In contrast to Chapter 21, Section 303.004 of the TBOC specifically addresses redemption of shares by a professional corporation. Section 303.004 provides,

> (a) A professional corporation may redeem shares of a shareholder, including a deceased shareholder.
>
> (b) The price and other terms of a redemption of shares may be:
>
>> (1) agreed to between the board of directors of the professional corporation and the shareholder or the shareholder's personal representative; or
>>
>> (2) specified in the governing documents of the professional corporation or an applicable agreement.

*Id.* § 303.004.[16]

Section 303.004 thus sets forth a more expansive ability to redeem professional-corporation stock than does Chapter 21 for for-profit corporations generally. Professional corporations may redeem shares even if those shares are not designated redeemable. But in doing so, Section 303.004(b) provides three ways in

---

[16]This section thus appears to authorize a professional corporation to redeem shares even if they were not designated as redeemable in its certificate of formation. *Compare id.* §§ 3.007, 303.004, *with id.* §§ 21.303–.304(a). This makes sense in light of Chapter 303's requirement that shares of a no-longer-licensed professional must be repurchased.

which the price and terms of such a redemption can be determined: (1) as agreed to between the board (or governing person or body) and the departing shareholder, (2) as set forth in a governing document, or (3) as set forth in an applicable agreement. Not included in this list is redemption on a price and terms set unilaterally by the board (or governing body or person).

Skeels contends that these three methods of determining the price and terms of redemption described in Section 303.004 are the exclusive methods by which to redeem shares in a professional corporation and that FSC has not shown its authority to redeem his shares under any method described in that section. FSC contends that the Resolution gave Friedman, Suder, and Cooke collectively the power to redeem shares under TBOC Chapter 21 rather than Section 303.004 and that even if it did not and Section 303.004 applies to redemption of Skeels's shares, it properly redeemed the shares under Section 303.004(b).

## B. Construction of the Resolution

The TBOC broadly authorizes a corporation's shareholders to enter into agreements with each other that, if otherwise effective, limit or are inconsistent with other provisions of the TBOC. *See id.* §§ 21.101, .104, .110. Construction of such an agreement's terms, as with other contracts, is a question of law if the terms are unambiguous. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999); *Rubinstein v. Lucchese, Inc.*, 497 S.W.3d 615, 625 (Tex. App.—Fort Worth 2016, no pet.); *see also Fishman v. C.O.D. Capital Corp.*, No. 05-16-00581-CV, 2017 WL

3033314, at *11 (Tex. App.—Dallas July 18, 2017, no pet.) (mem. op.) (applying ordinary contract-construction principles to shareholder agreement); *Wibbenmeyer v. TechTerra Commc'ns, Inc.*, No. 03-09-00122-CV, 2010 WL 1173072, at *4 (Tex. App.— Austin Mar. 26, 2010, pet. denied) (mem. op.) (same); *In re Martin Patrick Evan, Ltd.*, No. 14-05-00349-CV, 2005 WL 7877689, at *2–3 (Tex. App.—Houston [14th Dist.] June 1, 2005, orig. proceeding) (per curiam) (mem. op.) (same). The court's goal in interpreting a contract is to ascertain the parties' true intent as expressed by the plain language they used. *See Great Am. Ins. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). The court must examine the entire agreement to try to harmonize and give effect to all contractual provisions so that none will be meaningless. *MCI Telecomms.*, 995 S.W.2d at 652. In doing so, we give a contract term its plain and ordinary meaning unless the contract indicates the parties intended to give it a different meaning. *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012).

Reading the Resolution as a whole—giving effect to all its words—we discern that nothing in it purports to allow Friedman, Suder, and Cooke collectively to take action inconsistent with any specific provision of the TBOC or the TBOC in general, nor does it evidence an intent that FSC as an entity would not be bound by any particular TBOC provision, including Section 303.004. By its own terms, the Resolution shows nothing more than an intent that any affirmative action that *could* properly be taken by FSC would be decided by Friedman, Suder, and Cooke collectively and that those three could veto any action or purported action taken by

22

any other shareholders or group of shareholders on FSC's behalf. While the language of the Resolution gives Friedman, Suder, and Cooke broad powers vis à vis the other firm shareholders, in no way does it purport to allow those three to take *any* action they decide to take contrary to the TBOC or any other law. In the absence of any such provision, we conclude that the propriety of FSC's attempted redemption of Skeels's shares is governed by Section 303.004.

FSC urges us that the surrounding circumstances of the execution of the Resolution dictate otherwise because part of Friedman, Suder, and Cooke's intention in retaining the "sole ability to control firm operations" was to also retain the sole ability to control "who would become, and remain, a shareholder," citing Cooke's testimony at the temporary injunction hearing that the Resolution simply memorialized the firm's then-current custom: the "ultimate power and control existed" with Friedman, Suder, and Cooke. But that fact reinforces our construction of the Resolution's plain language: that it relates to the relationship among the shareholders vis à vis the taking of action that the firm was authorized to make but that it did not purport to authorize Friedman, Suder, and Cooke individually to take any action inconsistent with the TBOC, including Section 303.004.

## C. Section 303.004 limits methods of redemption for professional corporation's stock

FSC also argues that if Section 303.004 applies to the redemption of Skeels's shares, it nevertheless complied with that section because Section 303.004(b)'s use of

permissive language—"the price and other terms . . . *may* be . . . agreed to . . . or . . . specified"—means that professional corporations need only choose whether they want to redeem stock in accordance with that subsection. *See* Tex. Bus. Orgs. Code Ann. § 303.004(b) (emphasis added).

A statute that uses the word "may" is permissive rather than mandatory unless there is something in the statute to show a legislative intent that "may" is mandatory. *See Dallas Cty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 874 (Tex. 2005); *see* Tex. Gov't Code Ann. § 311.016(1). We agree that the "may" in Section 303.004(b) is used permissively but only in the context of that section, which lists three separate ways to designate the price and terms of a redemption of professional-corporation stock: the price and terms may be set forth in an agreement between the corporation's governing body and the departing shareholder; they may be set forth in a governing document; or they may be set forth in an "applicable agreement." Tex. Bus. Orgs. Code Ann. § 303.004(b). Nothing in this section indicates that redemption is authorized by any other method, such as the provisions applicable to for-profit corporations set forth in Chapter 21.[17] Thus, even though Section 303.004(b) uses the

---

[17]Nothing in the statutory scheme evidences an intent for professional corporations to use the Chapter 21 redemption procedure as a gap-filler in the event a professional corporation has not specified a redemption price and terms in a governing document or applicable agreement and is having difficulty coming to an agreement with a particular shareholder whose stock it wants to redeem. This is unlike, for example, Delaware law that provides for a gap-filler: if no redemption price for stock is specified in the professional corporation's certificate of formation or a shareholder agreement, it is redeemed for book value. Del. Code Ann. tit. 8, § 631.

permissive word "may"—when read in context with the larger Chapter 21 and Chapter 303 scheme—it does so only among the three choices specifically described in that subsection.

Not only is this interpretation of Section 303.004(b) in keeping with the general directive to strictly interpret redemption statutes, it also is in keeping with a legislative recognition of the need to provide more flexibility to a professional corporation and its shareholders vis à vis the entry and exit of shareholders as well as to provide some protection for shareholders from the abuses that can occur in closely-held corporations. *See* note 11, *supra.* Moreover, that Section 303.004(b) is intended to contain an exclusive list, any one of which may be chosen by the professional corporation, is bolstered by Section 303.008, which lists only two ways in which the price and terms "may" be set for a repurchase of the ownership interest of a professional-corporation shareholder (or the successor to that person's interest): in a governing document or applicable agreement. Tex. Bus. Orgs. Code Ann. § 303.008. Both of these sections indicate that the legislature intended that a professional-corporation shareholder's shares could not be unilaterally redeemed by the governing body without any input or knowledge of the shareholder of a specific agreement

But the fact that there is no gap-filler provision in the TBOC does not change the plain language of Section 303.004(b). This gap in the statutory scheme exemplifies the Catch-22 that can occur and why we encouraged the parties to mediate this dispute and attempt to come to an agreement before incurring even more attorney's fees and costs.

otherwise. *See generally id.* § 21.105 (allowing stock buyer to rescind purchase if he buys shares without knowledge of valid shareholder agreement's existence).

### D. Section 303.004 did not authorize unilateral redemption

Skeels contends that FSC was not authorized to redeem his shares under Section 303.004 because (1) he and FSC did not agree to the price or terms of redemption, (2) no governing document of FSC "specified" the price and terms of redemption, and (3) no "applicable agreement" set forth the price and terms of redemption. FSC contends that if Section 303.004 applies to this dispute, it nevertheless complied with its dictates because the Resolution is an applicable agreement[18] that allows Friedman, Suder, and Cooke collectively to unilaterally set the price and terms of redemption. FSC and Skeels primarily dispute whether the Resolution sufficiently "specified" the price and terms of redemption. Thus, we must determine the meaning of the word "specified" as used in Section 303.004(b).

In construing statutes, our primary objective is to give effect to legislative intent. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). We look first to the plain language as the most reliable guide to that intent, construing the text in light of the statute as a whole. *Id.* The statutory terms bear their common meanings, unless the text provides a different meaning or the common meaning leads to an absurd

---

[18]FSC had also argued in the trial court that the Resolution is a governing document. The trial judge agreed and issued a ruling to that effect.

26

result. *Id.* The statutory words must be interpreted considering the context in which they are used, not in isolation. *Id.*

Whether the Resolution could be considered an applicable agreement as opposed to a governing document does not matter for purposes of our analysis because even if it is either one, Section 303.004(b) requires the redemption price and terms to be "specified" in either type of document. The term "specified" is not defined in the TBOC. Merriam Webster defines "specify" as "to mention or name in a specific or explicit manner." Webster's Third New Int'l Dictionary 2187 (2002).

The Resolution itself is general and does not "specify" any topic in particular other than ultimate governance of the firm by Friedman, Suder, and Cooke collectively; not only does it not specify a particular price and terms of redemption, it also does not purport to expressly allow the three controlling shareholders to unilaterally set the price and terms of share redemption. Cooke admitted at the temporary injunction hearing that the Resolution did not specify that FSC could redeem a shareholder's shares for $0, but in his opinion, it was "intended to give . . . discretion broad enough to encompass things like that." But general discretion does not equate to a specific or explicit description. We cannot construe a resolution using general language that does not even mention redemption as naming or explicitly stating the price and terms of redemption. Thus, we hold that none of Section

303.004 authorized FSC's attempted redemption of Skeels's shares and that the trial court erroneously granted FSC's declaratory judgment and denied Skeels's.[19]

For these reasons, we sustain Skeels's first and second issues. As we explain below, our disposition of these two issues necessitates a remand of Skeels's remaining common law and statutory claims, as well as his request for attorney's fees. We therefore also sustain his third issue.

## IV. Admissibility Of Valuation Testimony Question For Remand

In his fifth issue,[20] Skeels challenges the trial court's ruling excluding Casparis's expert testimony on the valuation of Skeels's shares. According to Skeels, the testimony was relevant to prove whether FSC exceeded its statutory redemption authority by attempting to redeem the shares for only $0. But FSC argues, as it did in the trial court, that "the value of Skeels'[s] FSC shares has never been relevant to any of Skeels'[s] claims" and, therefore, that the expert's valuation opinions were "outside the pleadings . . . in the case."

Admissibility of expert testimony is a matter within the trial court's discretion. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to guiding rules or legal

---

[19]Therefore, we need not—and do not—hold that Section 303.004 does not authorize a professional corporation to redeem shares for $0.

[20]We dispose of his fourth issue in the conclusion below.

principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; instead, the test is whether the trial court acted without reference to any guiding rules and principles. *Id.* "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Id.* at 242.

Texas Rule of Evidence 702, which governs the admission of expert testimony, provides, "[I]f . . . scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue," a "witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tex. R. Evid. 702. A witness's expert testimony is admissible if the witness is qualified as an expert, the opinion is relevant to the issues in the case, and the opinion is based on a reliable foundation. *See id.*; *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002). "Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). Expert testimony is relevant if it is "sufficiently tied to the facts of the case" in a way that "will aid the jury in resolving a factual dispute." *Robinson*, 923 S.W.2d at 556. However, under Texas Rule of Evidence 402, evidence that is not relevant is

inadmissible. Tex. R. Evid. 402; *Kia Motors v. Ruiz*, 432 S.W.3d 865, 879, 882–83 (Tex. 2014).

The value of Skeels's shares was not relevant to the elements of his declaratory-judgment claim, nor are they relevant to his breach of contract or promissory estoppel claims. *See Bell v. Bennett*, Nos. 02-10-00481-CV, 02-11-00057-CV, 02-11-00063-CV, 2012 WL 858603, at *15 (Tex. App.—Fort Worth March 15, 2002, no pet.) (mem. op.). Although Skeels contends that Casparis's testimony is relevant to the legal question of whether FSC could redeem his shares for $0, as we have explained, FSC was not entitled by law to unilaterally redeem his shares at all. Skeels did not—and as we have explained, cannot—bring a claim to force FSC to redeem his shares, nor did he bring a claim premised on an alleged agreement to redeem his shares for any price.

However, in response to Skeels's statutory demand to examine FSC's books and records, FSC raised as a defense that Skeels had done so for an improper purpose. Skeels requested the records in response to FSC's offer to pay him for his shares, presumably to evaluate the adequacy of that offer. Whether his shares indeed have value could conceivably inform the dispute over whether he sought the records for a proper purpose, as required by Section 21.218 under which he sought the records. Tex. Bus. Orgs. Code Ann. § 21.218; *see also Uvalde Rock Asphalt Co. v. Loughridge*, 425 S.W.2d 818, 820 (Tex. 1968) (noting that corporation is entitled to a jury trial "in resisting a stockholder's attempt to inspect the [corporation's] books and records" when it "raises by its pleadings a fact issue over whether the stockholder has

a proper purpose for wanting to see the books"). Because we must remand that claim as explained below, we conclude that whether Casparis's testimony—or even Skeels's own lay testimony—should be excluded on retrial (either because of relevance or for the other reasons FSC raised in its challenge) is a question better determined by the trial court. We therefore sustain Skeels's fifth issue.

## V.    Reversal Of Declaratory Judgment Necessitates Reversal Of Sanctions

Skeels's sixth issue challenges the trial court's sanctions awards to Suder and Cooke individually. Within this issue, Skeels argues that Suder and Cooke failed to show good cause that any of his claims were groundless or asserted for an improper purpose, that the trial court failed to adequately connect the sanctions award to his conduct, and that $20,000 is an excessive amount for the complained-of conduct. As we explain below, we need not address most of his complaints. *See* Tex. R. App. P. 47.1.

### A.  Standard of review and applicable law

We review the imposition of sanctions for an abuse of discretion and reverse the trial court's ruling only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate an abuse of discretion. *Quixtar Inc. v. Signature Mgmt. Team, LLC*, 315 S.W.3d 28, 31 (Tex. 2010) (per curiam).

31

In reviewing the propriety of sanctions orders, we are not limited by a trial court's findings of fact and conclusions of law; rather, we must independently review the entire record to determine whether the trial court abused its discretion. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). But we defer to the trial court's factual findings unless no evidence supports them. *See Allison v. Conglomerate Gas II L.P.*, No. 02-13-00205-CV, 2015 WL 5106448, at *6 (Tex. App.—Fort Worth Aug. 31, 2015, no pet.) (mem. op.).

Suder and Cooke moved for sanctions under Rule 13,[21] which allows the imposition of sanctions for pleadings that are groundless and also filed either (1) in bad faith, (2) with the intent to harass, or (3) with the knowledge of their falsity when made. Tex. R. Civ. P. 13; *Nath v. Tex. Children's Hosp.,* 446 S.W.3d 355, 362–63 (Tex. 2014). Generally, courts presume pleadings and other papers are filed in good faith, and the party seeking sanctions bears the burden of overcoming this presumption of good faith. *Id.* at 361. A claim is groundless under Rule 13 if it has no basis in law or fact or if it is not warranted by a good faith argument for the extension, modification, or reversal of existing law. *Id.* at 362. In other words, a lawsuit is groundless under Rule 13 if no arguable basis for the cause of action exists. *Attorney Gen. of Tex. v.*

---

[21]Although the trial court found that appellees had moved for sanctions only under Rule 13, it purported to impose sanctions under both Rule 13 and Chapter 10 of the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 10.001, .002. Whether the trial court's decision to do so was proper, however, because of the different standards for the imposition of sanctions under the Rule as opposed to the statute, *see generally Allison*, 2015 WL 5106448, at *5–6, makes no difference to our analysis; therefore, we do not address that issue.

*Cartwright*, 874 S.W.2d 210, 215 (Tex. App.—Houston [14th Dist.] 1994, writ denied). This is essentially the same inquiry regarding whether a "claim, defense, or other legal contention in [a] pleading or motion" is frivolous under Civil Practice and Remedies Code Section 10.001(2). Tex. Civ. Prac. & Rem. Code Ann. § 10.001(2).

## B. Remand appropriate

The testimony and evidence presented at the sanctions hearing focused in large part on Skeels's motivation for bringing the claims in his original, first amended, and second amended petitions. The trial court had already decided the merits of the declaratory judgment claim and, by default, the remaining common law claims against FSC, including the alternative unjust-enrichment allegation against Suder and Cooke,[22] because—as Skeels's counsel represented to the trial court—those claims were premised on Skeels's remaining a shareholder in the firm.[23] But our remand of the

---

[22]The trial court found that there was no basis to bring such a claim against Suder and Cooke because Skeels had not filed a specific cause of action against either of them. *See Lawry v. Pecan Plantation Owners Ass'n*, No. 02-15-00079-CV, 2016 WL 4395777, at *6 (Tex. App.—Fort Worth Aug. 18, 2016, no pet.) (mem. op.) (noting that unjust enrichment is not an independent cause of action "but rather 'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay'"). But a careful reading of Skeels's second amended petition shows that he alleged FSC failed to observe corporate formalities and that FSC's complained-of acts were also the acts of Suder and Cooke individually so that Suder and Cooke should be jointly and severally liable with FSC.

[23]For example, Skeels denies that his breach of contract claim was based on a promise related to his continued employment; rather, it was based on his continued status as a shareholder regardless of whether he was employed by the firm: "I'm entitled to receive income as a shareholder for so long as I am a shareholder."

common law claims returns the suit and parties to the position they were in before the trial court granted the erroneous declaratory judgment: Skeels's live pleading asserts common law and statutory claims based on his shareholder status, to which FSC, Suder, and Cooke have filed answers seeking Rule 13 sanctions. There has not yet been a trial on the merits on those claims.[24] Were we to uphold the trial court's sanctions award on these untried claims, our decision could be merits-preclusive, *see Dickson v. BNSF Ry.*, No. 05-14-01575-CV, 2015 WL 6777876, at *7 (Tex. App.—Dallas Nov. 6, 2015, pet. denied) (mem. op.); thus, because of our disposition of Skeels's remaining claims, we also vacate the sanctions award and remand that issue as well. *See Smith v. City of Blanco*, No. 03-11-00091-CV, 2013 WL 491022, at *7 (Tex. App.—Austin Feb. 1, 2013, no pet.) (mem. op.) (remanding sanctions issue in light of appellate court's determination that res judicata did not apply to bar claims when sanctions award was largely based on trial court's erroneous ruling); *2055, Inc. v. McTague*, No. 05-08-01057-CV, 2009 WL 2506342, at *9 (Tex. App.—Dallas Aug. 18, 2009, no pet.) (mem. op.) (vacating sanctions order for frivolous pleading because of reversal of trial court's summary judgment); *Houtex Ready Mix Concrete & Materials v. Eagle Constr. & Envtl. Servs., L.P.*, 226 S.W.3d 514, 522 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that trial court abused its discretion by awarding Rule 13

---

[24]Appellees did not file their own notice of appeal challenging the trial court's denial of their motion for partial summary judgment, so we may not review the propriety of that denial on appeal. *See* Tex. R. App. P. 25.1(c).

sanctions for groundless pleading because appellate court reversed part of trial court's summary judgment).

The trial court also found that Skeels's abandoned derivative claims and individual breach of fiduciary duty claims against Suder and Cooke[25] were groundless and brought for an improper purpose: "maximizing the embarrassment and harassment of" appellees. The trial court reasoned that Skeels would not say why those claims were dropped and did not engage in any discovery on them. But sanctions on a claim are not warranted just because a plaintiff presents no evidence in support of the claim. *See Dunavin v. Meador*, No. 2-07-230-CV, 2008 WL 2780782, at *7 (Tex. App.—Fort Worth July 17, 2008, no pet.) (mem. op.). And Skeels testified that he and his then-counsel consulted a corporate-law attorney in evaluating those claims before filing them. *See, e.g.*, *Loeffler v. Lytle ISD*, 211 S.W.3d 331, 348 (Tex. App.—San Antonio 2006, pet. denied) (op. on reh'g) (noting that in determining groundlessness, court objectively considers whether "the party and counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the suit was filed").

Moreover, because of his shareholder status, Skeels was authorized to bring both the derivative and breach of fiduciary duty claims. *See* Tex. Bus. Orgs. Code Ann. § 21.563; *Sneed v. Webre*, 465 S.W.3d 169, 183 (Tex. 2015); *Ritchie*, 443 S.W.3d at 881–

---

[25]The parties focus their appellate arguments on the propriety of Skeels's suit in its entirety, including his claims against FSC. But the trial court awarded sanctions only to Suder and Cooke individually.

82. And because FSC is a closely held corporation, Skeels did not need to show that he fairly and adequately represented FSC's interests as a prerequisite to filing suit. *See* Tex. Bus. Orgs. Code Ann. §§ 21.552, .563(b). Neither Suder nor Cooke presented evidence showing that such claims were baseless in law or fact at the time they were filed, considering Skeels's then-current shareholder status, or that—considering the viability of at least the declaratory judgment claim—Skeels's reason for bringing the abandoned claims was merely to harass Suder and Cooke.[26]

Accordingly, we reverse the trial court's sanctions award in addition to the remainder of its judgment. We sustain Skeels's sixth issue.

## VI.  Conclusion

We reverse the trial court's declaratory judgment for FSC and render a declaratory judgment that FSC's attempted redemption of Skeels's shares was not authorized by the TBOC and is, therefore, of no effect. Because the $100,000 attorney's fees award to FSC was based on the trial court's disposition of FSC's counterclaim for declaratory judgment, we reverse that award as well and remand the issue of whether attorney's fees should be awarded to Skeels in light of our rendition of a declaratory judgment in his favor.[27] Likewise, because Skeels's common law and statutory mandamus claims were premised on his retaining shareholder status in FSC, and thus dependent on his prevailing on his declaratory judgment claim, we must

---

[26]We note that Section 21.563(c) leaves to the trial court the decision of whether to award damages directly to the suing shareholder "if justice requires." Tex. Bus. Orgs. Code Ann. § 21.563.

remand them for further proceedings. We also reverse the sanctions award of $10,000 each to Suder and Cooke.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: September 24, 2020

---

[27]We need not, therefore, address his fourth issue independently attacking the attorney's fees award. *See* Tex. R. App. P. 47.1.